RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0128p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

STEPHEN MATTHEW HOPKINS and JULIE R. HOPKINS,

    *Plaintiffs-Appellees*,

  *v.*

ANTHONY (TONY) NICHOLS and WILLIAM (BILLY) LAMB, in their individual and official capacities,

    *Defendants-Appellants*.

No. 21-5686

─────────────────

Appeal from the United States District Court for the Middle District of Tennessee at Columbia.
No. 1:19-cv-00059—William Lynn Campbell, Jr., District Judge.

Argued: March 10, 2022

Decided and Filed: June 16, 2022

Before: SUTTON, Chief Judge; GIBBONS and GRIFFIN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Robyn Beale Williams, FARRAR & BATES, LLP, Brentwood, Tennessee, for Appellants. Kyle Mothershead, Nashville, Tennessee, for Appellees. **ON BRIEF:** Robyn Beale Williams, FARRAR & BATES, LLP, Brentwood, Tennessee, for Appellants. Kyle Mothershead, Nashville, Tennessee, Frank Brazil, Wesley Clark, BRAZIL CLARK, LLC, Nashville, Tennessee, for Appellees.

─────────────────

## OPINION

─────────────────

GRIFFIN, Circuit Judge.

Plaintiffs Stephen Matthew and Julie Hopkins kept cattle on a farm in Tennessee. Suspecting animal cruelty, Marshall County Detective Anthony Nichols searched the farm.

He and Sheriff William Lamb later seized the cattle without a warrant.  Plaintiffs brought suit under 42 U.S.C. § 1983, alleging that Nichols and Lamb violated their Fourth Amendment right to be free from unreasonable searches and seizures.  The district court denied defendants qualified immunity as to those claims, which they now appeal.  We affirm.

I.

The Hopkinses owned a farm in Marshall County, Tennessee, on which they kept a herd of cattle.  In the early summer of 2018, Nichols received a complaint about the treatment of the cattle on the Hopkins's farm.  He drove by the farm and observed one dead cow in a creek and others that did not appear to be in good health.

On July 2, 2018, Nichols returned to the Hopkins's farm with Tennessee Department of Agriculture Veterinarian Jill Johnson.  Wearing his gun and badge, Nichols knocked on the back door of the house.  Mr. Hopkins was gone, but Mrs. Hopkins was home fixing lunch for their children.  According to Mrs. Hopkins, Nichols "demanded that [she] escort them to see the cattle on the property."  She asked Nichols twice if he could wait until Mr. Hopkins returned home or until she fed the children lunch, but both times he responded, "No, absolutely not.  I need to see them right now."  But with Nichols's permission, she called Mr. Hopkins to inform him of the situation.

Mrs. Hopkins then took Nichols and Johnson to the farm, where they observed the dead cow.  Johnson completed a Livestock Welfare Examination, as required by Tennessee law, *see* Tenn. Code Ann. § 39-14-211, in which she noted that the cattle were not in reasonable health, that they lacked access to appropriate water, food, or shelter, and that major disease issues were present in the herd.  Based on these findings, she determined that probable cause for animal cruelty existed.  Nichols returned to the Hopkins's farm several times over the following days to check on the cattle.

On July 12, Nichols and Johnson again returned to the Hopkins's farm.  The cattle were largely in the same poor condition.  Nichols and Johnson also discovered two skeletal remains in a wooded portion of the property and a sinkhole containing the remains of multiple cattle.  Johnson determined that probable cause for animal cruelty was present because the cattle still

appeared to be subject to an "unreasonable failure to provide livestock necessary food, water, care, or shelter." The following day, Nichols and Lamb re-entered the Hopkins's farm and seized the cattle without a warrant.

Following the seizure, Marshall County initiated criminal proceedings against Mr. Hopkins for animal cruelty. While those cases were pending, the cattle were sold due to cost of upkeep. The criminal charges were all dismissed on the condition that the Hopkinses pay for the care of the cattle from the sale proceeds.

In July 2019, the Hopkinses filed this lawsuit against Nichols and Lamb under § 1983. The Hopkinses contend that defendants violated their right to be free from unlawful searches and seizures under the Fourth Amendment. Defendants moved for summary judgment, arguing that they were entitled to qualified immunity. The district court denied qualified immunity to the officers on the Fourth Amendment claims. *Hopkins v. Nichols*, No. 1:19-cv-00059, 2021 WL 2784160, at *4 (M.D. Tenn. July 2, 2021).

Nichols and Lamb now appeal.

## II.

This appeal concerns two incidents: the alleged seizure of Mrs. Hopkins by Nichols and the warrantless seizures of the Hopkins's cattle. Defendants maintain that they are entitled to qualified immunity for both incidents. We disagree.

Public officials are entitled to qualified immunity, which shields them from personal liability under § 1983, unless they "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is the plaintiffs' burden to show that the defendants are not entitled to qualified immunity. *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012). To determine whether the defendants are entitled to qualified immunity, we must ask two questions: (1) "whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted). The district court concluded

that plaintiffs met their burden, and we review that decision de novo. *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019).

However, the scope of our review is limited. On an interlocutory appeal from the denial of qualified immunity, "we may not decide a challenge aimed solely at the district court's determination of the record-supported evidence, but we may decide a challenge with any legal aspect to it, no matter that it might encroach on the district court's fact-based determinations." *Bunkley v. City of Detroit*, 902 F.3d 552, 560 (6th Cir. 2018). And a "defendant challenging the denial of summary judgment on qualified immunity grounds must be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Hopper v. Plummer*, 887 F.3d 744, 757 (6th Cir. 2018) (citation omitted). Thus, we may consider only the legal question of whether the facts, taken in the light most favorable to the Hopkinses, support a claim that defendants violated clearly established law. *See Jacobs*, 915 F.3d at 1039–40.

A.

We begin with the alleged seizure of Mrs. Hopkins. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. This does not "proscribe all contact between the police and citizens, but is designed to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (quotation marks and citation omitted). A seizure of a person does not need to take the form of "physical force;" rather, it can be "a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (alteration in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). "[A]n initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Delgado*, 466 U.S. at 215 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). The applicable inquiry is "whether the challenged conduct *objectively* manifests an intent to restrain." *Torres*, 141 S. Ct. at 998.

We agree with the district court that defendants are not entitled to qualified immunity because, when viewing the facts in the light most favorable to the Hopkinses as we must, a seizure occurred. When Nichols arrived at the Hopkins's house, he told Mrs. Hopkins that she needed to take him to see their farm. He was wearing a badge and gun, though the gun was not brandished. Most importantly, when Mrs. Hopkins twice asked if Nichols could wait or delay the search, he responded, "No, absolutely not. I need to see [the cattle] right now." The "use of language . . . indicating that compliance with the officer's request might be compelled" may indicate that a seizure occurred. *Mendenhall*, 446 U.S. at 554. Mrs. Hopkins expressed an intent to refuse, delay, or avoid the search. By refusing her requests, Nichols objectively manifested an intent to seize Mrs. Hopkins by telling her that he would not wait or delay. When viewing these facts in the light most favorable to Mrs. Hopkins, a reasonable person in her position could easily have taken Nichols's two refusals as an indication that she *had* to comply with his orders.

Defendants argue that Mrs. Hopkins consented to the encounter, thereby dispelling the possibility that a seizure occurred. But this argument fails because of the same factual disputes. When viewing the facts in the Hopkins's favor, Nichols seized Mrs. Hopkins because she was not free to leave or terminate the encounter. In that circumstance, an illegal seizure occurred, so any consent given was invalid. *See United States v. Lopez-Arias*, 344 F.3d 623, 629 (6th Cir. 2003). In other words, whether consent was voluntarily given is necessarily intertwined with whether a seizure occurred. Defendants' challenges are thus predicated on questions of fact, which are not properly before us on an interlocutory appeal. *See Bunkley*, 902 F.3d at 560.

The question then becomes whether this right was clearly established as of July 2018. "To determine whether the law is clearly established we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Rhodes v. Michigan*, 10 F.4th 665, 680 (6th Cir. 2021) (citation omitted). The plaintiffs do not need to present "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (per curiam) (citation omitted). Whether the law is clearly established should not be defined "at a high level of generality," but rather must be "particularized" to the facts of the case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)

(citations omitted). We must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Id.*

Defendants argue on appeal that the Hopkinses have not identified any case establishing that the right at issue is clearly established. While the Hopkinses have not discussed the "clearly established" prong in much, if any, depth, we nevertheless conclude that the Hopkinses have carried their burden, if only just.[1] On appeal, the Hopkinses point to *Mendenhall*, which describes "the use of language or tone of voice indicating that compliance with the officer's request might be compelled" as an explicit example of "circumstances that might indicate a seizure." 446 U.S. at 554. And before the district court, the Hopkinses cited *United States v. Saari*, 272 F.3d 804 (6th Cir. 2001). In *Saari*, officers positioned themselves near the only exit from the defendant's home with guns drawn and knocked on the door to announce themselves; then "[u]pon opening the door, [the defendant] was instructed to come outside, which he did." 272 F.3d at 808. These circumstances amounted to a seizure: "the officers here summoned [the defendant] to exit his home and acted with such a show of authority that [the defendant] reasonably believed he had no choice but to comply." *Id.* at 809. Other cases hold similarly that forced compliance with an officer's order constitutes a seizure. *See, e.g.*, *United States v. Morgan*, 743 F.2d 1158, 1164 (6th Cir. 1984) (holding a seizure occurred when, after surrounding the house, "[t]he police then called for [the defendant] to come out of the house"); *Scozzari v. McGraw*, 500 F. App'x 421, 424 (6th Cir. 2012) (noting that, "when police position themselves outside a suspect's home and block the only exit, order a suspect to come outside, and the suspect does so, there has been a seizure").

---

[1]We note that this argument is indicative of broader errors committed by the parties both at the district court level and on appeal. For one, it is questionable whether the Hopkins's complaint raised an independent claim as to the seizure of Mrs. Hopkins; instead, it appears that they focused on whether Nichols's actions constituted an unlawful search. The Hopkinses first asserted a seizure occurred in their response to defendants' motion for summary judgment. Yet defendants never objected to this. Instead, they responded on the merits, arguing that Mrs. Hopkins was not seized. These errors, perhaps understandably, led the district court not to discuss the "clearly established" prong of the qualified immunity as it pertained to the seizure of Mrs. Hopkins.

Defendants raise a cursory argument on appeal that the complaint referred solely to the seizure of the cattle. Even if the argument were fully briefed, we do not have jurisdiction to address it on this interlocutory appeal. *See Crockett v. Cumberland College*, 316 F.3d 571, 577–78 (6th Cir. 2003).

These cases clearly establish that forced compliance with orders is a Fourth Amendment seizure. *Mendenhall* and *Saari* establish that words that compel compliance with the officer's orders to exit a house constitute a seizure. Thus, when taking the facts in the light most favorable to the Hopkinses, Nichols's commands to Mrs. Hopkins may have amounted to a clearly established constitutional violation. For those reasons, we conclude that the district court properly denied qualified immunity to defendants for the alleged seizure of Mrs. Hopkins.[2]

B.

We now turn to the seizure of the Hopkins's cattle. "In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983). If officers have probable cause but have not secured a warrant, the Fourth Amendment permits seizures "if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *Id.*

Defendants contend that the plain view exception to the warrant requirement applies, such that no constitutional violation occurred. Plain view is an exigent-circumstance exception to the warrant requirement. *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997 (6th Cir. 1994). Under the plain-view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Defendants contend that they were lawfully in a position to view the cattle through the open fields doctrine, that they had probable cause for animal cruelty because of the cattle's condition, and that the open fields doctrine again gave them lawful access to seize the cattle.

The open fields doctrine states "that the government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment."

---

[2]This conclusion is without prejudice as to the parties raising additional grounds in support of summary judgment on remand, such as whether the seizure of Mrs. Hopkins was sufficiently pleaded in the complaint.

*Oliver v. United States*, 466 U.S. 170, 177 (1984). This doctrine exists because "no expectation of privacy legitimately attaches to open fields." *Id.* at 180. But an open field "need be neither 'open' nor a 'field' as those terms are used in common speech," as it includes "any unoccupied or undeveloped area outside of the curtilage." *Id.* at 180 n.11. Application of this doctrine does not turn on the nuances of a particular case; "[t]he rather typical presence of fences, closed or locked gates, and 'No Trespassing' signs on an otherwise open field therefore has no constitutional import." *United States v. Rapanos*, 115 F.3d 367, 372 (6th Cir. 1997).

We disagree with the defendants' argument that the open fields doctrine authorized their seizure of the Hopkins's cattle. While the open fields doctrine allowed the officers to lawfully *search* the farm for the cattle, it did not give the officers lawful access to *seize* the cattle. The open fields doctrine is an exception to the Fourth Amendment prohibition on unreasonable searches, not seizures. *See Oliver*, 466 U.S. at 177 ("[T]he government's intrusion upon the open fields is not one of those '*unreasonable searches*' proscribed by the text of the Fourth Amendment." (emphasis added)); *United States v. Watkins Street Project, LLC*, No. 1:09-cr-144, 2010 WL 6789313, at *10 (E.D. Tenn. Oct. 28, 2010) ("[T]he open fields doctrine does not authorize *seizure* of property on an open field. It is an exception to the Fourth Amendment's prohibition against unreasonable *searches*."). While the officers could lawfully search the property under the open fields doctrine, that doctrine does not speak to whether they could seize the cattle.

Rather, "exigent circumstances" are needed for an officer to lawfully seize the property under the plain view exception. "[P]lain view alone is never enough to justify the warrantless seizure of evidence . . . [and] no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971) (plurality opinion). Generally, an officer must "get a warrant if possible before he seizes an item in plain view." *United States v. McLevain*, 310 F.3d 434, 443 (6th Cir. 2002). "He cannot seize absent exigent circumstances. If he could obtain a warrant, then he cannot use the 'plain view' exception for the evidence." *Id. See also United States v. Hare*, 589 F.2d 1291, 1294 (6th Cir. 1979) ("[I]f the police had probable cause to believe they would find the evidence or contraband

[b]efore making the seizure, and had an opportunity to obtain a warrant, any exigency which results is of their own making, and cannot serve as grounds for a warrantless seizure.").

Nichols and Lamb lacked exigent circumstances when they seized the cattle without a warrant. Nichols first saw the cattle on July 2, and Johnson prepared her first examination that day. Defendants continued to visit the farm over the next ten days, and, throughout that time, they observed sick cattle that were not recovering. On July 12, officers discovered the sinkhole with the remains of multiple cattle. That day, Johnson prepared her second examination finding probable cause. Even assuming that this second search and examination, but not the first, provided the officers with probable cause in the constitutional sense, it was not until *the next day* that defendants returned to seize the cattle without a warrant. This delay provided the officers with ample time to get a warrant, but they did not do so. Because they had probable cause and an opportunity to obtain a search warrant, no exigency existed. *See McLevain*, 310 F.3d at 443. Therefore, defendants did not have lawful access to seize the cattle under the plain view doctrine and, because no exception to the warrant requirement existed, defendants may have committed a constitutional violation.

Further, it is clearly established that police officers may not seize property without exigent circumstances. *Coolidge* prohibits this exact situation: "no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.'" 403 U.S. at 468. And in *McLevain*, we held that a police officer committed a constitutional violation by seizing and testing suspected drugs while the defendant was in custody and the other occupants of the house were under the supervision of officers. 310 F.3d at 443. In those circumstances, the officer did not have a lawful right of access to the evidence because it "was not going anywhere." *Id*. The officer instead "should have taken his evidence of probable cause to a magistrate rather than attempting to seize it under the 'plain view' exception." *Id. See also United States v. Barry*, 673 F.2d 912, 917–18 (6th Cir. 1982) (holding a search and seizure of a package was illegal because the officers "unquestionabl[y]" had sufficient time to seek a warrant).

This caselaw is sufficiently analogous to put Nichols and Lamb on notice that, "in the light of pre-existing law the unlawfulness [was] apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The officers had the ability and plenty of opportunity to obtain a search

warrant, but they did not do so, and as in *McLevain*, the incriminating evidence was not at risk of going anywhere. Therefore, they may have violated a clearly established right, and accordingly, the district court properly denied qualified immunity to the defendants.

III.

For these reasons, we affirm the judgment of the district court.