RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0110p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DAVID HIEBER,

*Plaintiff-Appellant*,

*v.*

OAKLAND COUNTY, MICHIGAN; KYLE JEN,

*Defendants-Appellees*.

┐
│
│
├ No. 24-1345
│
│
┘

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:22-cv-11417—F. Kay Behm, District Judge.

Argued: March 19, 2025

Decided and Filed: April 29, 2025

Before: SUTTON, Chief Judge; GRIFFIN and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Kevin J. Kelly, THE MASTROMARCO FIRM, Saginaw, Michigan, for Appellant. Christopher M. Trebilcock, CLARK HILL PLC, Detroit, Michigan, for Appellees. **ON BRIEF:** Kevin J. Kelly, THE MASTROMARCO FIRM, Saginaw, Michigan, for Appellant. Christopher M. Trebilcock, Brian D. Shekell, CLARK HILL PLC, Detroit, Michigan, for Appellees.

───────────────

## OPINION

───────────────

MATHIS, Circuit Judge. For almost twenty years, David Hieber led Oakland County's Equalization Department. But then an employee reported him for creating a hostile work environment. The County investigated the complaint and terminated Hieber as a result. Hieber sued both Oakland County and his supervisor, Kyle Jen, under 42 U.S.C. § 1983 for deprivation

of pretermination and post-termination due process, political-affiliation retaliation, and age discrimination.  He also brought state-law claims for defamation and age discrimination. Oakland County and Jen moved for summary judgment, which the district court granted.  We reverse the grant of summary judgment to Oakland County and Jen, in his official capacity, on Hieber's pretermination due-process claim.  In all other respects, we affirm.

## I.

Oakland County hired Hieber in 1994, when L. Brooks Patterson—a Republican—was County Executive.  Around 2002, the County promoted Hieber to the top position in its Equalization Department.  He remained in that role until his termination in 2021.

After Patterson died in 2019, the County appointed David Coulter—a Democrat—to replace him.  Hieber contends that the work environment soured with the new administration. For example, Coulter hired April Lynch as the Deputy County Executive for the Human Resources ("HR") Department.  Lynch allegedly showed bias against older employees and created a discriminatory work environment.  For one, an employee overheard Lynch refer to two female employees as "grandmas," while someone else heard her complain about all the "dead wood" at the County.  R. 72-9, PageID 2539; R. 64-26, PageID 1506.  Lynch conveyed that she would "get rid" of these employees "one way or another" because they had "been there too long."  R. 64-26, PageID 1507.  Lynch also championed a Voluntary Early Separation Incentive Program ("VESIP"), which allowed the County to offer full-time employees a separation incentive.[1]  Lynch supported the program because it would "enable [the County] to prepare a workforce for the future; one that is competitive, nimble and reflective of the diversity of our county."  R. 64-5, PageID 1137.

Another change accompanied the Coulter administration's arrival.  For the first time in Hieber's Oakland County career, an employee filed an HR complaint against him.  In September 2020, Hieber held a virtual meeting with eight subordinate supervisors.  Hieber interrupted the meeting to tell them about a text he received from his daughter—her math teacher circulated a

---

[1]Hieber decided not to participate in VESIP.

survey asking students to identify their preferred pronouns.  Hieber questioned why the teacher needed to know his daughter's pronouns and stated that the teacher should use her name instead.

Hieber's subordinate, Bryan Paris, is "a member of the LGBT community" and believed these comments were "meant to harass and intimidate" him.  R. 63-15, PageID 1066.  So Paris filed a complaint ("2020 Complaint") alleging that the comment was "part of a broader pattern" of discriminatory behavior and that Hieber had a longstanding bullying problem.  Upon completing an investigation, however, the County concluded that the allegations of discriminatory behavior were unfounded and that Hieber's comment was "an isolated incident." R. 64-1, PageID 1114.  Even so, Defendants required Hieber to attend supervisory coaching sessions following the investigation.

That was not the last complaint from Paris.  About a year later, Paris filed another complaint against Hieber for allegedly creating a hostile work environment ("2021 Complaint"), this time with a representative of the Equalization Department's newly formed union.  His grievance centered on an anonymous workplace-diversity survey circulated by the County ("DEI survey").  Someone had told Paris that Hieber was "openly bashing" the survey to Equalization Department employees Rob Doyle and Alex McLeod.

The HR Manager, Julie Fisher, opened an investigation.  Early on, HR interviewed Doyle.  He explained that Hieber brought up the DEI survey after approaching him and McLeod. Hieber allegedly told them that he would not take the survey and that, if Jen told him to do it, he would lie about it.  Doyle believed Hieber was worried about the survey results because "there could not be more of a toxic, hostile work environment" than the Equalization Department, which included acts of "retaliation" and "intim[id]ation" by Hieber.  R. 64-8, PageID 1170.

Doyle had other troubling things to say about Hieber.  Because Doyle was a union chair, Hieber supposedly called him during union negotiations.  Hieber was so upset that he was left out of the union and threatened to withhold resources from it.  To offset costs following the unionization, Doyle said that Hieber threatened to demote employees.  Doyle also told investigators that Hieber was "mentally unstable," "easily could be a freaking shooter," and was

"the type that would lose it" and "could shoot."  *Id.* at 1197.  He feared for his safety and suggested that the County increase security.

Defendants acted quickly on this information.  Just a few hours after Doyle's interview, Jen texted Hieber and asked him to stop by his office to discuss an HR matter.  Before Hieber could do so, Fisher notified him that the County was placing him on paid administrative leave.  When he asked why, Fisher referenced "shifting union work" and Hieber's "comments on" the DEI survey.  R. 63-2, PageID 753.  The leave notice instructed Hieber not to contact any subordinate employees, conduct County business, or come onsite to any County property.  A plainclothes deputy then escorted Hieber from the office to his car.

The next day, Jen emailed the Equalization Department (around 80 employees) that Hieber was on leave ("October 2021 email").  The email instructed them to work from home that day and the following business day.  Jen also told employees to park in the public parking lot and to only use the building's main entrance until further notice.  He noted his intent "to ensure that employees work in a safe environment free of intimidation, coercion, harassment, retaliation, or discrimination," and reminded them of their rights under the Michigan Whistleblowers' Protection Act.  R. 72-17, PageID 2712.

In the meantime, the County continued its investigation.  At close, it interviewed eleven employees.  Most verified Paris's hostile-work-environment allegations.  To start, McLeod confirmed Doyle's version of the interaction with Hieber, as did another employee who overheard the conversation, Amanda Marshall.  Several employees also claimed that Hieber pit employees against each other; fostered a toxic work environment; and used "intimidation tactics, fear, [and] bullying to control" employees.  R. 64-12, PageID 1283.

Oakland County, through its corporation counsel, also interviewed Hieber during the investigation.  With Hieber's attorney present, County counsel asked him about the union, the survey, and the 2020 Complaint.  Hieber denied making any threats related to the union.  As for the DEI survey, Hieber only recalled explaining his belief that the survey was not truly anonymous.  Counsel then asked him about inappropriate comments he allegedly made.  Hieber denied making such comments.  When County counsel gave Hieber a chance to make a

statement, Hieber addressed the DEI survey, the union, and his comment about his daughter's pronoun preference.

About ten days later, the County notified Hieber of its intent to terminate his employment. As a merit-systems employee, the County could only fire Hieber for cause. The notice identified two bases for his termination: (1) "[c]onduct or performance on the job which demonstrates a deliberate attempt to cause poor morale or disrespect among County employees by actions or attitude on the job," and (2) "[t]he willful violation" of the County's nondiscrimination policy. R. 64-15, PageID 1352. The notice concluded that Hieber had created a hostile work environment and engaged in behavior employees described as "intimidating and vengeful." *Id.* It identified seven specific discriminatory comments he allegedly made; his failure to learn from the coaching sessions following the 2020 Complaint; his comment about the DEI survey; and his supposed threats to the union.

Finally, the notice informed Hieber of a pretermination hearing scheduled for the next day. The notice said the hearing would "provide [Hieber] the opportunity to respond" to the charges. *Id.* at 1351. At the same time, Hieber received conflicting information from an HR employee, Rosie Wood. When Hieber's attorney asked to postpone the hearing, Wood replied that it would be "brief, to inform [] Hieber of the notice of being terminated and to provide the department[']s cause." R. 72-20, PageID 2723. The email added that the hearing was "not the time that [] Hieber would plead his case, that would be done afterward" on appeal to an independent body, the Personnel Appeal Board ("PAB"). *Id.*

So Hieber and his attorney went forward with the hearing. It lasted only six minutes. Jen, representing the County, stated the County's intent to terminate Hieber for the reasons stated in the notice. Fisher, acting as the hearing officer, then asked Hieber if he wanted "to make a statement on [his] behalf." R. 64-20, PageID 1408. Hieber denied the charges and noted his understanding "that the termination was a predetermined outcome of [the] meeting" and it "was not the time to plead [his] case." *Id.* Hieber's attorney reiterated their belief "that today would not be the opportunity for him to plead his case." *Id.* at 1409. Fisher responded that this understanding was "correct" and that the hearing was "just to make sure that [Hieber] is aware of

the action being taken and understands the reason why, not necessarily that he agrees or disagrees with anything." *Id.* Shortly after, Fisher issued a decision upholding the termination.

The next day, Jen emailed the Equalization Department again, this time announcing Hieber's termination ("November 2021 email"). The email told employees that Hieber should not contact staff or come onsite, and to report any contact from him. If he appeared onsite or at an employee's house, the email directed them to call 911. And it instructed employees to continue parking in the public lot and entering through the main entrance. Finally, the email reiterated the County's "goal . . . to build a more supportive working environment within the Equalization Division." R. 64-23, PageID 1422.

Following his termination, Hieber appealed to the PAB. The PAB panel consisted of the chair of Oakland County's Board of Commissioners and two individuals unaffiliated with the County. Hilarie Chambers, Chief Deputy County Executive, knew one of the panel members. In fact, in an email to County Executive Coulter and HR Deputy Lynch, Chambers referred to that panel member as "one of [her] besties!!" R. 72-24, PageID 2799.

About two weeks before the PAB hearing, Hieber's counsel told the County he planned to call eleven witnesses and that he may use affidavits. Hieber's counsel also raised concerns about witness cooperation. County counsel assured Hieber that it would make "all efforts possible" to ensure witness cooperation. Hieber also requested certain documents from the County that he never received.

These issues came to a head at the PAB hearing. At the start, County counsel objected to using affidavits. After an off-record discussion, the PAB panel chair decided not to allow any affidavits. The panel also told Hieber it lacked authority to subpoena witnesses to testify. Following these decisions, the panel told Hieber it would reconvene the hearing another day so that the witnesses who gave affidavits could participate. Meanwhile, County counsel would contact Hieber's identified witnesses to let them know that the County would not keep them from testifying.

The parties proceeded with the hearing but only examined one witness due to time constraints. They agreed to continue the hearing, but Hieber later abandoned his appeal and filed

this lawsuit instead.  He sued Oakland County and Jen, in his individual and official capacities, under 42 U.S.C. § 1983 for deprivation of pretermination and post-termination due process, political-affiliation retaliation, and age discrimination.  He also brought state-law claims for defamation against Jen and age discrimination against both Defendants.  Hieber now appeals the district court's grant of summary judgment in Defendants' favor.[2]

## II.

We review summary-judgment decisions de novo.  *Campbell v. Riahi*, 109 F.4th 854, 860 (6th Cir. 2024).  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  We view all evidence and draw all reasonable inferences in the light most favorable to the nonmoving party.  *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022).

Hieber challenges the district court's grant of summary judgment to Defendants on his claims for procedural-due-process deprivation, political-affiliation retaliation, defamation, and age discrimination.  We address each argument in turn.

### A.    Due-Process Claims

The Fourteenth Amendment's Due Process Clause prohibits "any State" from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  "[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).  It thus "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

This case concerns procedural due process.  Procedural due process requires notice and an opportunity to be heard "at a meaningful time and in a meaningful manner" if the State seeks to deprive someone of constitutionally protected liberty or property interests.  *Armstrong v.*

---

[2]Hieber also appeals the district court's denial of his motion to enforce a settlement agreement with Oakland County.  But because Hieber fails to argue that the district court erred in denying that motion, he forfeited any challenge to the district court's order.  *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018).

*Manzo*, 380 U.S. 545, 552 (1965).   "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). And its protections extend "to government deprivation of those perquisites of government employment in which the employee has a constitutionally protected 'property' interest." *Gilbert v. Homar*, 520 U.S. 924, 928 (1997).

Hieber contends that Oakland County and Jen violated his due-process rights by firing him without providing him with appropriate pretermination and post-termination hearings. To succeed on a procedural-due-process claim, a plaintiff must establish "two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). Hieber easily satisfies the first element. The parties agree that, as a merit-systems employee, Hieber had "a property right in [his] continued employment" with Oakland County because he could be terminated only for cause. *See Loudermill*, 470 U.S. at 538 (citations omitted). So resolution of Hieber's due-process claims turns on whether he received inadequate process.

*Pretermination Due Process*. The Due Process Clause's "root requirement" is "an opportunity for a hearing *before* [an individual] is deprived of any significant property interest." *Id.* at 542 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)). In *Loudermill*, the Supreme Court held that public employers must provide a pretermination hearing before terminating an employee with a property interest in his employment. *Id.* at 542–45. "[A] full evidentiary hearing" is not required, *id.* at 545 (citation omitted), and the "formality" of the hearing "can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings," *Boddie*, 401 U.S. at 378.

Indeed, a pretermination hearing can be "very limited" when "followed by a more comprehensive post-termination hearing." *Gilbert*, 520 U.S. at 929. At bottom, a pretermination hearing must act as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Loudermill*, 470 U.S. at 545–46. In some cases, an informal meeting between the employee and his supervisor, *Loudermill v. Cleveland Bd. of Educ.*,

844 F.2d 304, 307, 311 (6th Cir. 1988), or even an investigatory interview, *Buckner v. City of Highland Park*, 901 F.2d 491, 496 (6th Cir. 1990), can serve as the pretermination hearing.

Hieber was entitled to a pretermination hearing. Whatever the formality, a pretermination hearing must include: "[1] oral or written notice of the charges, [2] an explanation of the employer's evidence, and [3] an opportunity for the employee to tell his side of the story." *Gilbert*, 520 U.S. at 929 (citation omitted). All three elements are important. But "[t]he critical element" is whether the employee had an opportunity to respond to the evidence against him. *See Buckner*, 901 F.2d at 495. The chance to respond "is a fundamental requirement of any fair procedural system," and "must be a meaningful opportunity to prevent the deprivation from occurring." *Id.*; *see also Loudermill*, 470 U.S. at 546 ("The opportunity to present reasons, either in person or in writing, why [the] proposed action should not be taken is a fundamental due process requirement.").

Oakland County argues that it satisfied *Loudermill*'s pretermination-hearing requirements through (1) the investigatory interview, and (2) the pretermination hearing. But a reasonable jury could find otherwise.

Start with the investigatory interview. County counsel interviewed Hieber during the investigation into the 2021 Complaint. County counsel told Hieber the investigation's "focus" was the union, the DEI survey, and the 2020 Complaint. R. 64-18, PageID 1364. County counsel never told Hieber the specific charges against him—causing poor morale or disrespect among Oakland County employees and violating the nondiscrimination policy. And a jury could find that Oakland County failed to explain the evidence against Hieber during the interview. Consider, for example, the questions about the DEI survey. County counsel asked Hieber whether he would dispute an employee's "theoretical[]" comment about hearing Hieber say that he would lie about the survey. *Id.* at 1382. This question did not put Hieber on notice of Oakland County's specific evidence about the survey. *See Lane v. City of Pickerington*, 588 F. App'x 456, 464 (6th Cir. 2014) (employer did not explain its evidence when it denied the plaintiff an opportunity to review photographs the employer charged him with inappropriately possessing).

In *Buckner*, we held that an "interrogation" can be—but is not always—part of "a full and fair opportunity to respond to charges." 901 F.2d at 496. There, though "the charges against [the plaintiff] were not formally presented," the investigation gave him "the gist of the allegations against him." *Id.* at 495. Indeed, during the interrogation, the employer's agents showed the plaintiff the written complaint against him, discussed the charges with him, and asked him to respond. *Id.* at 492, 495. We thus concluded that the interview satisfied *Loudermill*'s requirements, explaining that "[w]hen an employee is faced with charges that a reasonable person would recognize as jeopardizing an employment future, extra pretermination due process obligations are not placed on the employer." *Id.* at 495–46; *see also Loudermill*, 844 F.2d at 311 (pretermination due process was satisfied where the supervisor met with the plaintiff, identified the charge against him, showed him evidence supporting the charge, allowed him to respond, and gave him additional time to supplement his response).

Oakland County asserts that, like in *Buckner*, the interview informed Hieber of the charges and evidence against him. We disagree. A review of the interview transcript shows that County counsel provided Hieber with the general topics of the interview and questioned him about those topics. But those topics did not match the charges that Oakland County brought against Hieber in advance of his formal pretermination hearing. *See McDaniel v. Princeton City Sch. Dist. Bd. of Educ.*, 45 F. App'x 354, 358–59 (6th Cir. 2002) (employer violated the plaintiff's pretermination due-process rights where charges identified in the termination letter differed from those identified in the termination notice). The interview transcript therefore creates a jury question about whether County counsel's questions on the topics gave Hieber "the gist" of the charges against him, or whether "a reasonable person would [have] recognize[d]" that his "employment future" was at risk. *Buckner*, 901 F.2d at 495–96.

Likewise, a jury could find that Oakland County failed to provide Hieber with the evidence against him. True enough, County counsel asked Hieber for "[his] take on comments that some employees have mentioned." R. 64-18, PageID 1384. In doing so, County counsel stated that he was "not intending" for his questions "to be anything other than me asking you what your recollection is or [to] explore your knowledge about it." *Id.* Yet Oakland County later relied on some of those comments as evidence of Hieber's misconduct in the termination

notice.   More troubling, the termination notice also identified comments the parties never discussed during the interview.  *See Lane*, 588 F. App'x at 464.

All in all, though employers need not give notice of the charges with "exacting specificity," *Devlin v. Kalm*, 531 F. App'x 697, 708 (6th Cir. 2013), there is a material factual dispute about whether the interview gave Hieber sufficient notice of the charges and evidence against him or gave him "an opportunity to present his side of the story," *Loudermill*, 470 U.S. at 546.

Moving next to the formal pretermination hearing.  A genuine dispute of material fact exists about whether the hearing was deficient—but for a different reason.  Because he received the termination notice before the hearing, Hieber at least had adequate notice of the charges and the evidence against him at that point.  But a jury could find that Oakland County did not give him a meaningful chance to respond to the charges and evidence.  Before the hearing, Rosie Wood, Oakland County's HR representative, told Hieber's counsel that the hearing's purpose was "to inform [] Hieber of the notice of being terminated and to provide the department[']s cause.  Also, this is not the time that [] Hieber would plead his case, that would be done afterward through the [PAB] process."  R. 72-20, PageID 2723.  Then at the hearing, the hearing officer asked Hieber if he wanted "to make a statement on [his] behalf."  R. 64-20, PageID 1408. Hieber denied the charges and noted his understanding that "the termination was a predetermined outcome of [the] meeting" and that it "was not the time to plead [his] case."  *Id.*   The hearing officer confirmed this by stating that the hearing was "just to make sure that [Hieber] is aware of the action being taken and understands the reason why, not necessarily that he agrees or disagrees with anything."  *Id.* at 1409.

Typically, "[t]he employee, being confronted with the charges against him or her and being offered the chance to give a version of the incident, is responsible for the choice to not offer any competing evidence."  *Buckner*, 901 F.2d at 495 (citation omitted).  But here, both before and during the hearing, County employees assured Hieber that it was not the time to "plead his case" or explain whether "he agrees or disagrees" with the termination action. Because County employees told Hieber at every step that the pretermination hearing was not his time to respond, a jury must decide whether Oakland County gave Hieber "a meaningful

opportunity to prevent the deprivation from occurring." *Buckner*, 901 F.2d at 495; *cf. Lane*, 588 F. App'x at 464–65 (lack of meaningful opportunity to respond when the defendants never presented their evidence against the plaintiff and failed to notify him of all charges); *McDaniel*, 45 F. App'x at 358–59 (similar).

*Post-termination Due Process*.   The district court did not err in granting summary judgment to Oakland County on Hieber's post-termination due-process claim.   An employee "waive[s] his procedural due process claim" when he "refuses to participate or chooses not to participate in the post-termination proceedings." *Farhat v. Jopke*, 370 F.3d 580, 596 (6th Cir. 2004).   Hieber abandoned his PAB appeal by not participating in the hearing to its conclusion. In the process, he waived any post-deprivation due-process claim and we will not consider it here. *See id.*

To the extent that Oakland County suggests Hieber also waived his pretermination due-process claim, we disagree.   In *Farhat*, we found that the plaintiff's failure to pursue post-termination process waived only his post-termination due-process claim. *Id.* at 597.   And rightly so.   In this context, adequate post-termination process cannot cure insufficient pretermination process. *See Loudermill*, 470 U.S. at 542; *Zinermon v. Burch*, 494 U.S. 113, 132 (1990) ("In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking.").   As a result, neither the PAB hearing nor its waiver impacts Hieber's pretermination due-process claim.

*Qualified Immunity*.   Jen asserts that he is entitled to qualified immunity on Hieber's due-process claims in his individual capacity.   Qualified immunity protects public officials from civil liability when their actions did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quotation omitted).   To defeat a qualified-immunity defense, Hieber must show: (1) that Jen violated his right to procedural due process, and (2) that the due-process right at issue was clearly established at the time of the violation. *See Hopkins v. Nichols*, 37 F.4th 1110, 1114–15 (6th Cir. 2022).   And crucially here, Hieber must prove that Jen, "through [his] own individual actions, has violated the Constitution.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Harris v.*

*City of Saginaw*, 62 F.4th 1028, 1036 (6th Cir. 2023) (officer was entitled to qualified immunity where he "was not personally involved in the incident alleged to have resulted in a violation of [the plaintiff's] constitutional rights").

Jen is entitled to qualified immunity on Hieber's due-process claims. Hieber waived his post-termination due-process claim against Jen by not completing the PAB appeal hearing process. As for his pretermination claim, Hieber failed to establish Jen's responsibility for the alleged violation. County counsel—not Jen—conducted the investigatory interview. And as Hieber acknowledges, it was the County's HR representative—not Jen—who "told Plaintiff that the pretermination hearing was 'not the time' Plaintiff 'would plead his case.'" D. 36 at p.50. Plus, Jen represented Oakland County at the pretermination hearing. He had no control over what Hieber could say or present. Instead, the hearing officer conducted the proceedings. Hieber has failed to establish Jen's personal involvement in any due-process deprivation, thus negating any constitutional violation by Jen. *See Iqbal*, 556 U.S. at 676.

*        *        *

In sum, the district court erred in granting summary judgment to Oakland County and Jen in his official capacity on Hieber's pretermination procedural-due-process claim. The district court correctly granted summary judgment to the County on Hieber's post-termination claim. And the district court correctly granted qualified immunity to Jen in his individual capacity on the due-process claims.

**B.        Political-Affiliation Retaliation Claim**

The First Amendment protects an individual's right to engage in political expression and association. *McCutcheon v. FEC*, 572 U.S. 185, 203–04 (2014). Government officials thus cannot "mak[e] employment decisions, such as hiring or firing, based on the employee's political beliefs, affiliation, or support." *Lucas v. Monroe County*, 203 F.3d 964, 975 (6th Cir. 2000). To establish retaliation based on political association, a plaintiff must show: (1) he engaged in protected conduct; (2) the defendant took an adverse action "against him that would deter a person of ordinary firmness from continuing to engage in that conduct"; and (3) "a causal connection" between his protected conduct and the adverse action. *Kubala v. Smith*, 984 F.3d

1132, 1139 (6th Cir. 2021) (quotation omitted).  Upon doing so, the burden "shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Dye v. Off. of Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012) (internal quotation marks omitted).

Protected political activity "most commonly includes adopting certain political beliefs, supporting a particular political candidate, or affiliating with a political party or group." *Garvey v. Montgomery*, 128 F. App'x 453, 458 (6th Cir. 2005).  The First Amendment protects not only against retaliation based on actual political association, but it also provides protection based on "*perceived* political affiliation." *Dye*, 702 F.3d at 300 (emphasis added).

Hieber contends that Defendants terminated him because they perceived him to be politically affiliated with the Patterson administration.  He maintains that the following evidence creates an issue of material fact: (1) statements from two employees that they considered Hieber part of the Patterson administration; and (2) Lynch's "desire to get rid of" older employees— those hired under the Patterson administration.

This evidence does not suffice to create a prima facie case of political-affiliation retaliation.  True enough, a few employees in the Equalization Department viewed Hieber as part of the Patterson administration.  But no evidence showed that they affiliated him with a particular political party as a result.  Nor does the evidence reveal that Defendants implemented the VESIP program—which was available to all full-time eligible employees—to eliminate employees hired under the Patterson administration.  Most important, there is no evidence that Jen—the ultimate decisionmaker—or any other member of County leadership affiliated Hieber with either Patterson or the Republican Party.

Hieber's attempt to analogize this case to *Dye* falls flat.  In *Dye*, one plaintiff argued that his employer demoted him because of his perceived political affiliation.  *Id.* at 305.  The plaintiff's employer knew he supported a Republican political candidate, and the plaintiff presented evidence that the employer treated Republican employees less favorably.  *Id.* at 300– 02.  We concluded that there was a genuine dispute about political-affiliation retaliation.  *Id.* at 302, 308.  But here, Hieber presents no evidence that he engaged in any political conduct or that

Oakland County treated employees differently based on their political affiliation. In fact, Hieber testified that he never discussed his political beliefs with Jen. This lack of evidence dooms Hieber's claim. *See Bluegrass Dutch Tr. Morehead, LLC v. Rowan Cnty. Fiscal Ct.*, 734 F. App'x 322, 328–29 (6th Cir. 2018) (affirming summary judgment when the plaintiff failed to provide "any evidence beyond speculation that" any decisionmaker knew that the plaintiff supported a certain political candidate).

### C. Defamation Claim

Hieber's defamation claim against Jen fails. To prove a defamation claim under Michigan law, a plaintiff must show:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.

*Smith v. Anonymous Joint Enter.*, 793 N.W.2d 533, 540 (Mich. 2010) (quotation omitted). Michigan recognizes "defamation by implication," which allows defamation claims "based not on what is affirmatively stated, but on what is implied when a defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts." *Reighard v. ESPN, Inc.*, 991 N.W.2d 803, 811 (Mich. Ct. App. 2022) (per curiam) (internal quotation marks omitted). To succeed, the plaintiff must prove that the "defamatory *implications* are materially false." *Id.* (quotation omitted).

But Michigan law recognizes qualified privilege as a protection against some otherwise defamatory statements. For qualified privilege to apply, the defendant must show: "(1) good faith; (2) an interest to be upheld; (3) a statement limited in scope to this purpose; (4) a proper occasion; and (5) publication in a proper manner and to proper parties only." *Ryniewicz v. Clarivate Analytics*, 803 F. App'x 858, 867 (6th Cir. 2020) (citing *Bufalino v. Maxon Bros., Inc.*, 117 N.W.2d 150, 153 (Mich. 1962)). This privilege allows employers "to defame an employee by publishing statements to other employees whose duties interest them in the subject matter." *Id.* at 868 (quotation omitted). To overcome qualified privilege, the plaintiff must show that the

defendant acted with "actual malice," or in other words, with "knowledge of [the statement's] falsity or . . . in reckless disregard of the truth." *Id.* (citation omitted).

Hieber's defamation claim rests on Jen's October 2021 and November 2021 emails to the Equalization Department. The October 2021 email—which informed employees of Hieber's administrative leave—instructed employees to work from home, park in the public parking lot, and enter through the main entrance. Similarly, the November 2021 email—which informed employees of Hieber's termination—recommended employees call 911 if they saw Hieber either onsite or at their homes. It also instructed them to continue parking in the public lot and entering through the main entrance. And both emails assured employees that Jen's goal was to ensure a safe work environment free from harassment and discrimination.

Hieber contends that the emails constitute defamation by implication because they implied he was dangerous and had threatened employees' safety. Assuming the emails were defamatory, Hieber still cannot overcome qualified privilege.

Hieber challenges only the good-faith element of the qualified-privilege test, claiming that Jen did not send the emails in good faith. But the evidence confirms that he did. Jen testified that he meant for the emails to update Equalization Department employees on "ongoing operations." R. 72-29, PageID 2974. He also explained that Oakland County instituted increased security measures because employees had expressed "concerns . . . about their physical safety." *Id.* at 2967. For example, Doyle told investigators that he thought Hieber was "mentally unstable," "easily could be a freaking shooter," and was "the type that would lose it." R. 64-8, PageID 1197. So "in conjunction" with County leadership and HR, Jen decided to "tak[e] measures to err on the side of ensuring our employees were safe." R. 72-29, PageID 2968. This supports that Jen acted in good faith by sending the October 2021 email.

The same rationale applies to the November 2021 email. Jen explained that his "intention" in sending the email "was to ensure the physical and psychological safety of the employees of the Division." *Id.* at 2986. He noted that he acted "on the information [the County] had at hand, and us[ed] [his] best judgment and err[ed] on the side of ensuring that the employees were safe." *Id.* at 2987–88. Indeed, Jen sent the email after the investigation.

And the investigation did not alleviate concerns that Hieber could engage in violent or retaliatory behavior. For example, employees described Hieber as a "psychopath"; "unstable"; "bipolar"; or as having "a personality disorder." R. 64-9, PageID 1205, 1231; R. 64-11, PageID 1275; R. 64-13, PageID 1314. One employee even told investigators that he drove a different car to the office because he believed Hieber would be "sitting in the parking lot wondering who" was participating in the investigation. R. 64-10, PageID 1249.

Jen satisfies the remaining qualified-privilege elements as well. He had an interest in informing the Equalization Department about changes in its leadership, explaining safety protocols, and reiterating the County's nondiscrimination policy. *See Patillo v. Equitable Life Assurance Soc'y of U.S.*, 502 N.W.2d 696, 699 (Mich. Ct. App. 1992) (per curiam) (employer had an interest in communicating company's policies, though not in releasing reasons for the plaintiff's termination). And Jen's emails were limited in scope to these purposes; made on proper occasions; and sent only to relevant parties (employees in the Equalization Department). As a result, qualified privilege applies to the October 2021 and November 2021 emails.

Though a plaintiff can rebut qualified privilege by showing actual malice, Hieber has not done so. To establish actual malice, a plaintiff must show that the defendant "knowingly [made] a false statement or [made] a false statement in reckless disregard of the truth." *Smith*, 793 N.W.2d at 540–41 (citation omitted). A defendant recklessly disregards the truth by making a statement "with a high degree of awareness of probable falsity," or by "entertain[ing] serious doubts as to the truth of [the] publication." *Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 531 (6th Cir. 2014) (quotation omitted). Plaintiffs must provide clear and convincing evidence of actual malice to overcome the privilege. *Smith*, 793 N.W.2d at 541. As a result, "[g]eneral allegations that privileged statements were false and malicious are insufficient to create a genuine issue of fact" about actual malice. *Kefgen v. Davidson*, 617 N.W.2d 351, 359 (Mich. Ct. App. 2000).

Hieber merely asserts that the "undisclosed facts" Jen relied on "were not true and fabricated," and that Jen "intentionally created [] false implications" about him. D. 36 at pp.26, 72. But Hieber provides no evidence—let alone any that is clear and convincing—that Jen knew

he never posed a safety threat.  Because Hieber cannot show Jen acted with actual malice, his defamation claim fails.

### D.        Age-Discrimination Claims

The Elliott-Larsen Civil Rights Act ("ELCRA") prohibits employers from discriminating against employees because of their age.  Mich. Comp. Laws § 37.2202(1)(a).  We analyze ELCRA claims like we do Age Discrimination in Employment Act ("ADEA") claims.  *Geiger v. Tower Auto.*, 579 F.3d 614, 626 (6th Cir. 2009).  A plaintiff relying on circumstantial evidence of age discrimination must establish a prima facie case using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020).

To establish a prima facie case of age discrimination, a plaintiff must show: (1) he was over the age of 40; (2) the defendant took an adverse employment action against him; (3) he was qualified for his position; and (4) the defendant replaced him with someone outside of his protected class or treated him differently than a similarly situated nonprotected employee. *McNeal v. City of Blue Ash*, 117 F.4th 887, 895 (6th Cir. 2024).  Upon establishing a prima facie case, the burden shifts to the defendant to identify a legitimate, nondiscriminatory reason for its actions.  *Willard*, 952 F.3d at 807.  If the defendant provides such a reason, then the burden shifts back to the plaintiff to show pretext.  *Id.*

We assume without deciding that Hieber established a prima facie case of age discrimination.  The burden thus shifted to Defendants to proffer a legitimate, nondiscriminatory reason for his termination.  *See id.*  Defendants did so by presenting evidence that they terminated Hieber for the reasons in the termination notice.

The burden then shifted back to Hieber to show that these reasons were pretext for discrimination.  *See id.*  A plaintiff satisfies this burden at summary judgment by providing enough evidence for a reasonable factfinder to reject the employer's legitimate, nondiscriminatory reason.  *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021).  A plaintiff can prove pretext by showing that the defendant's proffered reason: "(1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate

the adverse employment action."  *Id.* (quotation omitted).  "Whichever method the plaintiff employs, he always bears the burden of producing sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him."  *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (quotation and alterations omitted).  Hieber tries to show pretext using all three methods.  Each attempt fails.

Hieber first argues that Defendants' reasons are pretextual because they were not based in fact.  But the honest-belief rule defeats this argument.  Under the honest-belief rule, a defendant may rebut certain pretext evidence by providing "conclusive evidence that the defendant honestly believed its proffered reason, and that the belief was reasonably based on particularized facts that were before it at the time the decision was made."  *Briggs*, 11 F.4th at 515 (internal quotation marks omitted).  "[A]s long as an employer ha[d] an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect."  *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citation omitted).

Jen based the termination decision on the investigation results.  And Hieber proffers no evidence that Jen did not honestly believe the misconduct uncovered during the investigation occurred and merited termination.  Instead, Hieber contends that the honest-belief rule does not apply because Jen's decision rested on hearsay.  But beyond his own denials, Hieber provides no evidence that the "hearsay" statements identified in the notice were false.  And without evidence rebutting that Jen honestly believed the allegations of misconduct, Hieber cannot overcome the honest-belief rule.  *See Bhama v. Mercy Mem'l Hosp. Corp.*, 416 F. App'x 542, 553 (6th Cir. 2011) (honest-belief rule can apply "even if [the plaintiff] could show that the complaints [against the plaintiff] were factually false" (citation omitted)); *Majewski*, 274 F.3d at 1117 (the plaintiff's denial that he engaged in misconduct was "insufficient to call into question [the defendant's] honest belief that he did").

Next, Hieber asserts that his conduct did not warrant termination because Paris engaged in similar conduct without being fired.  Hieber points to a complaint filed against Paris sometime in 2021.  An employee alleged that Paris made an inappropriate comment about her sexuality.

Oakland County asserts that HR investigated the complaint and interviewed both the complaining employee and Paris. Because the two disputed what happened, the County claims it decided not to discipline Paris but added the incident to his personnel file. Relying on this complaint, Hieber argues that he and Paris both violated the County's nondiscrimination policy, but Defendants only investigated and fired him.

When determining whether employees engaged in similar misconduct, we look to "the type, circumstances, and respective severity of the misconduct alleged." *Spratt v. FCA US LLC*, 812 F. App'x 348, 355 (6th Cir. 2020). "The relative severity of two actions is not determined solely by whether those actions violated the same company rule or policy." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 780 (6th Cir. 2016). Instead, we consider "both the actual and potential consequences of the employee's actions." *Id.* Importantly, "a plaintiff cannot establish a reasonable inference of discriminatory motive based on her employer's more severe treatment of more egregious circumstances." *Id.* at 777 (internal quotation marks omitted). And here, Hieber engaged in more serious and severe misconduct than Paris.

The complaint against Paris identified one inappropriate comment. In contrast, the 2021 Complaint against Hieber alleged not only that he disparaged the DEI survey, but that he fostered a hostile and discriminatory work environment. Then the initial interviews raised a variety of inappropriate and troubling behavior from Hieber. This substantial difference in misconduct justified a difference in treatment by the County. *See, e.g.*, *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 287 (6th Cir. 2012). Plus, employers "are entitled to greater flexibility in management-level employment decisions." *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 611 (6th Cir. 2013) (internal quotation marks omitted). All in all, Hieber cannot show that his conduct did not warrant termination.

Finally, Hieber contends that the "discriminatory atmosphere" and Defendants' failure to follow policy during the PAB hearing show that his misconduct was not the real reason they fired him. He points to Lynch's comments about "grandmas" and "dead wood," as well as Oakland County's VESIP program. But these isolated comments from a nondecisionmaker do not show pretext. *See Blizzard*, 698 F.3d at 287 (discriminatory comments unrelated to the adverse action "do not constitute evidence of discrimination"); *Risch v. Royal Oak Police Dep't*,

581 F.3d 383, 393 (6th Cir. 2009) ("[D]iscriminatory statements by a nondecisionmaker, standing alone, generally do not support an inference of discrimination[.]" (quotation omitted)). Nor does the mere existence of an early retirement program suggest age discrimination. *See Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 514 (6th Cir. 1991). True, Lynch circulated a memo stating that VESIP would let Oakland County "prepare a workforce . . . that is competitive, nimble and reflective of the diversity of [the] county." R. 64-5, PageID 1137. But this "ambiguous" language does not clearly relate to age, nor was the memo connected to Hieber's termination. *See Blizzard*, 698 F.3d at 287. Lastly, "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 896 (6th Cir. 2020) (quotation omitted)). Thus, Hieber cannot show that his misconduct was not the real reason Defendants fired him.

In sum, Hieber fails to show that his termination was pretext for discrimination. His ELCRA age-discrimination claim therefore fails.

What about Hieber's § 1983 age-discrimination claim? Most of our sister circuits have concluded that the ADEA preempts such claims. *See Hildebrand v. Allegheny County*, 757 F.3d 99, 110 (3d Cir. 2014); *Ahlmeyer v. Nev. Sys. of Higher Educ.*, 555 F.3d 1051, 1060 (9th Cir. 2009); *Tapia-Tapia v. Potter*, 322 F.3d 742, 745 (1st Cir. 2003); *Migneault v. Peck*, 158 F.3d 1131, 1140 (10th Cir. 1998), *vacated on other grounds sub nom. Bd. of Regents of Univ. of N.M. v. Migneault*, 528 U.S. 1110 (2000); *Lafleur v. Tex. Dep't of Health*, 126 F.3d 758, 760 (5th Cir. 1997) (per curiam); *Chennareddy v. Bowsher*, 935 F.2d 315, 318 (D.C. Cir. 1991); *Zombro v. Balt. City Police Dep't*, 868 F.2d 1364, 1369 (4th Cir. 1989). *But see Levin v. Madigan*, 692 F.3d 607, 617 (7th Cir. 2012) (holding that the ADEA does not preempt § 1983 age-discrimination claims). We need not reach the preemption argument here. Even if Hieber can bring a § 1983 age-discrimination claim, it fails for the same reasons as his ELCRA claim. *See Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (applying *McDonnell Douglas* burden-shifting framework to § 1983 discrimination claim).

**III.**

For these reasons, we **AFFIRM** the district court's judgment on Hieber's claims against Defendants for deprivation of his post-termination procedural-due-process rights, political-affiliation retaliation, and age discrimination. We also **AFFIRM** the district court's judgment on his defamation claim and his pretermination due-process claim against Jen in his individual capacity. We **REVERSE** the district court's judgment on Hieber's pretermination procedural-due-process claim against Oakland County and Jen in his official capacity, and **REMAND** for further proceedings consistent with this opinion.