NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0143n.06

No. 25-5169

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Mar 18, 2026

KELLY L. STEPHENS, Clerk

|   |   |   |
|---|---|---|
| MARK F. BERGENS, | ) | |
| Plaintiff-Appellant, | ) ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| DIVERSE CONCEPTS, LLC; ISLAND | ) | TENNESSEE |
| AMENITIES, LLC; SMOKY MOUNTAIN | ) | |
| BLUE MOOSE, LLC, | ) | OPINION |
| Defendants-Appellees. | ) ) | |

Before: DAVIS, RITZ, and HERMANDORFER, Circuit Judges.

HERMANDORFER, Circuit Judge. Diverse Concepts, LLC fired Mark Bergens after he searched his co-workers' bags for moonshine without their permission. This discrimination lawsuit followed. In challenging his firing, Bergens downplays the moonshine incident as a misunderstood prank. He says his termination in fact stemmed from Diverse Concepts's desire to offload Bergens after he suffered a stroke. So, as Bergens tells it, Diverse Concepts seized upon the moonshine incident as a pretext to terminate him. The district court granted summary judgment to Diverse Concepts. Because Bergens failed to create a genuine dispute that his termination was pretextual, we affirm.

I

Diverse Concepts is a hospitality-management group that "support[s] popular restaurants, hotels, retail shops, and entertainment centers." Resp. to Statement of Undisputed Facts, R.33,

PageID 1247. Two of those restaurants are relevant here: the Timberwood Grill and the Blue Moose Alcoa.[1]

In May 2022, Diverse Concepts hired Bergens as an assistant manager at the Timberwood Grill. During the hiring process, Diverse Concepts told Bergens that if he performed well, he could be promoted to general manager of the Blue Moose Alcoa, a new restaurant Diverse Concepts was planning to open in early 2023. True to its word, Diverse Concepts formally offered Bergens the general manager position at the Blue Moose Alcoa on August 19, 2022.

Just three days later, Bergens suffered a stroke. The stroke caused him to miss two weeks of work. Diverse Concepts continued to pay Bergens during his absence—even though he had not accrued any paid leave—and Diverse Concepts's director of operations, Scott MacDonald, visited Bergens in the hospital. Paul Delahunt, Diverse Concepts's vice president of operations, explained that he continued to pay Bergens because Bergens "was our guy," and he and MacDonald "felt strongly that we wanted to take care of him financially so that he would be there" to open the Blue Moose Alcoa. Delahunt Dep., R.28, PageID 297.

On September 5, 2022, Bergens returned to work at the Timberwood Grill. That same day, Bergens texted a message of appreciation that thanked Delahunt "for working with me the past couple of weeks" and concluded "I owe you guys." Bergens Dep., R.28, PageID 208.

Because he had not yet fully recovered from the stroke, Bergens kept his right arm in a sling. That prompted his co-workers to refer to Bergens as the "one arm bandit." *Id.* at PageID

---

[1] The entities that own those restaurants are also defendants in this case. Island Amenities, LLC owns the Timberwood Grill. Smoky Mountain Blue Moose, LLC owns the Blue Moose Alcoa. Like the district court and the parties, we refer to the defendants collectively as Diverse Concepts.

190-91. Bergens understood the nickname to be "a funny joke," yet also claimed it was "hurtful." *Id.* Either way, he never reported the comments to senior management.

Diverse Concepts granted Bergens every accommodation he asked for, including allowing him to arrive late or leave early for physical therapy appointments. Bergens also periodically texted with MacDonald about the opening of the Blue Moose Alcoa. But in the days and weeks that followed his return, Delahunt and MacDonald questioned Bergens's ability to train himself and other employees, worried that Bergens's rehabilitation wasn't "going as rapidly as we were hoping," and questioned whether Bergens might be "susceptible for another stroke." *Id.* at PageID 194. Still, as of October 13, 2022, internal company records continued to list Bergens as the anticipated general manager of the Blue Moose Alcoa.

Then came the moonshine incident. On October 18, 2022, Bergens asked Daniel King—another assistant manager at the Timberwood Grill—to obtain two jars of moonshine for him from a nearby distillery. King refused that request but eventually relented at Bergens's insistence. When King returned to the Timberwood Grill with the moonshine, he decided to play a "joke" on Bergens. King Dep., R.28, PageID 305. King hid the moonshine in the manager's office and told Bergens that he gave the moonshine to Kristy Biddle, a fellow assistant manager.

Bergens went to the manager's office to search for the moonshine. What happened next was caught on security-camera footage.[2] Bergens pulled open the partially unzipped flap of Biddle's bag to look inside. He then felt the outside of Biddle's and King's bags to determine whether a jar of moonshine was inside. Next, Bergens opened King's bag and stuck his hand inside. The video footage ends at that point. But King entered the office shortly thereafter and

---

[2] Although Diverse Concepts did not preserve the original footage, Paula Perham, the Timberwood Grill's general manager, filmed part of the original footage on her cellphone.

laughed with Bergens about the events. The two men then chatted about their favorite moonshine drinks.

Later that evening, King told Biddle that Bergens had searched her bag. Biddle was "very upset," because she "felt extremely violated" by Bergens's looking into her bag. Perham Dep., R.28, PageID 434. King, too, testified that he was "upset" by Bergens's search, which he felt was an "invasion of privacy and a breach of trust." King Dep., R.28, PageID 311, 313. So the next day, King and Biddle reported the incident to Paula Perham, the Timberwood Grill's general manager. King told Perham that the incident started as a "joke" that King played on Bergens. *Id.* at PageID 307.

Perham sent a partial video of the security-camera footage, recorded on her phone, to MacDonald. The recording depicts Bergens's search of King's and Biddle's bags. It also contains Biddle's and King's commentary. Among other statements, King can be heard exclaiming that Bergens "opens my f***ing backpack." Video 0:31-0:35. After receiving the video recording, MacDonald contacted Delahunt. The two then had a conference call with Perham, during which Perham relayed that Biddle and King were upset by Bergens's search of their bags.

As upper-level executives of Diverse Concepts, it was Delahunt and MacDonald who had the authority to terminate Bergens. The two men watched the video and discussed how to proceed. Delahunt decided that it was "pretty cut and dry": Bergens was "going through other managers' bags without permission" and those managers were "furious." Delahunt Dep., R.28, PageID 276. Bergens, in Delahunt's view, demonstrated a "clear lack of judgment and a lack of character." *Id.* at PageID 278. Delahunt also believed that the rest of the staff at the Timberwood Grill were "going to learn of what happened," which would "cause an issue" with "securing the trust" of "all of the employees of Timberwood," including King and Biddle. *Id.* at PageID 276.

Future employees of the Blue Moose Alcoa, too, would learn of the incident, which would "cause an issue hiring and/or just securing the trust of those employees." *Id.* So Delahunt couldn't have Bergens "working in any restaurant." *Id.* at PageID 278. He therefore decided to terminate Bergens.

But before doing so, Delahunt wanted to make sure that he wasn't missing part of the story. So he and MacDonald called Bergens. On the call, Delahunt asked Bergens if he "had gone through Mr. King's and Ms. Biddle's personal bags." Bergens Dep., R.28, PageID 203-04. Bergens responded "no." *Id.* at PageID 204. After Delahunt told Bergens that he watched the video footage, Bergens began "explaining what had happened." *Id.* at PageID 203. That switch-up made Delahunt believe that Bergens "was not credible and that he was lying." Delahunt Dep., R.28, PageID 297. At the end of the call, Delahunt fired Bergens.

After filing a complaint with the Equal Employment Opportunity Commission and receiving a right-to-sue notice, Bergens sued Diverse Concepts in federal court. As relevant here, Bergens alleged that Diverse Concepts violated the Americans with Disabilities Act (ADA) and Tennessee state law. In Bergens's view, Diverse Concepts fired him not because of the moonshine incident, but because it worried that he would not be able to handle opening the Blue Moose Alcoa after his stroke. The district court granted summary judgment to Diverse Concepts. Bergens timely appealed.

II

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to" the "hiring, advancement, or discharge of employees," and "other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). That statute requires a plaintiff to show that his disability was the "but-for" cause of the employer's adverse

5

action. *Pemberton v. Bell's Brewery, Inc.*, 150 F.4th 751, 767 (6th Cir. 2025) (citation omitted), *petition for cert. filed*, No. 25-6798 (Feb. 12, 2026).

The parties agree that we should evaluate Bergens's ADA claim using the *McDonnell-Douglas* framework. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Bergens's state-law claims are evaluated under the same standard. *See Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 (6th Cir. 2013) (per curiam). The *McDonnell-Douglas* framework requires a plaintiff to first establish a prima facie case of discrimination. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020). If he clears that hurdle, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the plaintiff's termination. *Id.* Assuming the defendant does so, the burden shifts back to the plaintiff to establish that the proffered reason is pretextual. *Id.*

Diverse Concepts, for its part, does not dispute that Bergens can satisfy the first step of that framework, the prima facie case. Bergens, in turn, does not dispute that Diverse Concepts has met the second step of that framework by identifying a legitimate, nondiscriminatory reason for his termination: the loss of trust that resulted from the moonshine incident. So this case turns on the third step, pretext.

The district court held that Bergens "failed to create a genuine issue of fact as to whether" Diverse Concepts's "proffered reason for terminating him was actually a pretext designed to mask unlawful discrimination" and, as such, "no reasonable juror could find" in his favor. SJ Op., R.61, PageID 1775-76, 1778. We review that holding de novo. *Miles*, 946 F.3d at 887.

Pretext "is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.* at 888 (citation omitted). Plaintiffs "typically show pretext in one of three ways": with evidence "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did

6

not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action." *Id.* (citation modified). But those categories are not exhaustive, so a plaintiff "may also demonstrate pretext by offering" any other "evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 320 (6th Cir. 2019) (citation omitted). When doing so, "a plaintiff must articulate some cognizable explanation of how the evidence [he] has put forth establishes pretext." *Miles*, 946 F.3d at 888.

Bergens offers arguments under the first and third categories, as well as other evidence of pretext. We address each argument in turn, mindful that at this stage Bergens need only demonstrate "a *genuine issue* as to whether" Diverse Concepts's stated "rationale is pretextual." *Babb*, 942 F.3d at 320 (citation omitted). Ultimately, we agree with the district court that Bergens has failed to establish a genuine dispute about pretext.

A

Bergens first argues that Diverse Concepts's stated justification for his termination has "no basis in fact." *Miles*, 946 F.3d at 888 (citation omitted). That argument fails in light of the video footage and undisputed testimony.

To show that an employer's stated justification has no basis in fact, the employee must show that "the employer's allegations never happened." *Id.* at 888-89. The "question is always whether the employer made up its stated reason to conceal intentional discrimination." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326-27 (6th Cir. 2021) (citation omitted).

Bergens can't show that Diverse Concepts's stated justification has no basis in fact. Diverse Concepts says it terminated Bergens because it lost trust in him after he searched King's

and Biddle's bags without permission. The video footage shows that Bergens indeed searched King's and Biddle's bags. And when Delahunt confronted Bergens about the situation, Bergens initially denied that he had searched King's and Biddle's bags before switching course. That evidence shows that Diverse Concepts's stated rationale for firing Bergens—the loss of trust caused by the moonshine incident—is not "made up." *Id.* at 327 (citation omitted).

Bergens contends that Diverse Concepts's characterization of the incident is "exaggerated" and its "narrative of broken trust" is "contrived" because Bergens was "the target of a coworker's prank." Bergens Br. 47. But Bergens's objections center on the descriptions of the incident provided by lower-level Diverse Concepts employees, who claimed that Bergens was "digging" or "rummaging" through the bags. *Id.* It was Delahunt, though, who was the ultimate decisionmaker over Bergens's termination. And he characterized Bergens's actions as follows: Bergens "frisk[ed] the bags" and "put . . . his left hand" in "at least one" bag. Delahunt Dep., R.28, PageID 278. That description is hardly exaggerated. Nor were Delahunt's concerns contrived. Bergens does not dispute that Biddle was upset by his actions. Bergens also does not dispute that when Delahunt asked him whether he "had gone through Mr. King's and Ms. Biddle's personal bags," Bergens initially responded "no." Bergens Dep., R.28, PageID 203-04. So Diverse Concepts's justification for firing Bergens is based in fact.

Even accepting Bergens's framing, his argument still runs aground on the honest-belief rule. That rule allows an employer to "rebut certain pretext evidence" at summary judgment by showing that it "honestly believed its proffered reason, and that the belief was reasonably based on particularized facts that were before it at the time the decision was made." *Hieber v. Oakland Cnty.*, 136 F.4th 308, 328 (6th Cir. 2025) (citation omitted). In applying the honest-belief rule, it

is important to home in on the actions and knowledge of the actual decisionmakers with authority over the challenged employment action.

Here, all agree that Delahunt made the ultimate decision to terminate Bergens. And in making that decision, Delahunt believed that Bergens had searched the bags of two managers, that those managers were upset by Bergens's actions, and that Bergens, when confronted about the issue, initially offered an account that contradicted the video evidence. That belief was "reasonably based on particularized facts"—Delahunt's review of the video footage and conversations with Perham and MacDonald. *Id.* (citation omitted).

To overcome the honest-belief rule, Bergens "must put forth evidence which demonstrates that" Delahunt "did not honestly believe in the proffered non-discriminatory reason." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012) (citation modified). He has not met that burden. Bergens contends only that Delahunt "didn't conduct a reasonable investigation," so his belief "cannot be said to be honestly held." Reply Br. 15-16 (citation omitted). But the employer's "investigation process does not need to be perfect." *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1030 (6th Cir. 2010). And here, undisputed evidence establishes that Delahunt viewed Bergens's misconduct on video, was informed that King and Biddle were upset, questioned Bergens about the incident, and fired Bergens after receiving an inaccurate response. We have held that investigations similar to Diverse Concepts's are sufficient to invoke the honest-belief rule. *See, e.g.*, *Hieber*, 136 F.4th at 329 (review of hearsay statements sufficient to invoke honest-belief rule). At a minimum, then, the honest-belief rule forecloses Bergens's argument that the stated justification for his termination has no basis in fact.

B

Bergens next points to comparator evidence. He contends that a reasonable jury could conclude that his termination was pretextual because Diverse Concepts failed to fire three other employees—Robert Cartree, Daniel King, and Jack Coppinger—for similar or more serious misconduct. But Bergens is not similarly situated to his proffered comparators, so Diverse Concepts's failure to fire those individuals does not create a genuine dispute about pretext.

A plaintiff seeking to demonstrate pretext using comparator evidence must identify "employees outside the protected class" who "were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its" discharge "of the plaintiff." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). Those employees must be "similar" to the plaintiff in "all relevant respects." *Miles*, 946 F.3d at 893 (citation omitted). To determine whether the proposed comparators are similarly situated, we consider several factors, including whether they "dealt with the same supervisor," were "subject to the same standards," and "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (citation omitted).

*Robert Cartree.* Cartree was a bar supervisor who "dumped beer bottle caps" into King's backpack. King Dep., R.28, PageID 302. King never reported the incident, and Cartree was never disciplined for his actions.

Diverse Concepts's failure to fire Cartree is not evidence of pretext because Cartree is not "similar" to Bergens in "all relevant respects." *Miles*, 946 F.3d at 893 (citation omitted). Cartree and Bergens did not "deal[] with the same supervisor." *Id.* (citation omitted). Bergens was an assistant manager who had been promoted to incoming general manager of the Blue Moose Alcoa.

Bergens's immediate supervisor was Paula Perham, the general manager of the Timberwood Grill. Cartree, by contrast, was a mid-level employee whose supervisor was a different assistant manager, Daniel King. And "it cannot be said that conduct that might be tolerated" in the "lower ranks must be similarly accepted from" higher-level employees "who are held to a higher level of professionalism and who are expected to set the standard of conduct for the employer." *Id.* at 894 (citation modified). In addition, Bergens and Cartree did not engage in "substantially identical conduct." *Id.* at 893 (citation omitted). Bergens searched employees' bags in a way that violated their trust. Cartree did not. Bergens's actions upset employees. Cartree's did not. So Cartree is not a valid comparator.

Beyond that, Bergens identifies no evidence that Delahunt and MacDonald were aware of Cartree's actions before firing Bergens. King, for his part, testified that he never reported the incident. And Bergens informed Delahunt and MacDonald of Cartree's actions only after his termination. Comparator evidence, though, is a way to tease out the decisionmakers' true motive by showing differential treatment of like cases. *See Chattman*, 686 F.3d at 349. Delahunt and MacDonald's failure to discipline Cartree thus falls flat without evidence that they knew of the Cartree incident when they disciplined Bergens. *Cf. id.* at 350 (plaintiff established genuine dispute about pretext by presenting "direct evidence that [company] management knew about common incidents of horseplay but failed to act on them").

*Daniel King.* King depicted male genitals using "vegetables and put it on the expo line," where he told "staff it was their lunch." Delahunt Dep., R.28, PageID 281. King was also difficult to manage, immature, and gave away free food. But Diverse Concepts's failure to discipline King for those problems is not evidence of pretext. King's misconduct is not "substantially identical" to Bergens's actions. *Miles*, 946 F.3d at 893 (citation omitted). Indeed, it is nothing alike at all.

11

King created a lewd display. Bergens, by contrast, breached his co-workers' trust by searching their private belongings. And King is not "similar" to Bergens in "all relevant respects." *Id.* (citation omitted). King, unlike Bergens, had not been promoted to serve as incoming general manager of another restaurant.

*Jack Coppinger.* Coppinger was hired as an assistant manager at another of Diverse Concepts's restaurants, the Blue Moose Pigeon Forge. While there, Coppinger violated Diverse Concepts's employee handbook by having a sexual relationship with a subordinate. Rather than discipling Coppinger for that misconduct, Diverse Concepts promoted him to general manager of the Blue Moose Alcoa after it fired Bergens. Once promoted, Coppinger continued to engage in "unprofessional" behavior by talking to subordinates about "drinking and partying and past drugs," as well as "his exploits with ladies." MacDonald Dep., R.28, PageID 331. He was subsequently demoted to assistant manager of the Timberwood Grill.

Diverse Concepts's treatment of Coppinger is not evidence of pretext. As with Bergens's other comparators, Coppinger and Bergens did not engage in "substantially identical conduct." *Miles*, 946 F.3d at 893 (citation omitted). Coppinger's misconduct did not cause a breach of trust and is nothing like Bergens's actions. Not to mention, Coppinger's conduct did later lead to his demotion.

At bottom, Bergens's proffered comparators are too dissimilar to be probative of Diverse Concepts's motivation for firing Bergens. So "no reasonable juror" could conclude that Bergens's comparator evidence creates a genuine dispute about pretext. *Id.* at 895.

Bergens's principal response seeks to raise the level of generality at which he characterizes the comparator evidence. He contends, for instance, that he is similarly situated to Cartree and King because MacDonald described all their misconduct as "zero tolerance" behavior. MacDonald

Dep., R.28, PageID 330. There are several problems with that argument. To start, Bergens overstates the record. MacDonald did not identify King's and Cartree's misconduct as fitting within his understanding of zero-tolerance offenses; he instead spoke more generally about the categories of misbehavior that would be zero-tolerance offenses. Moreover, Bergens's approach is inconsistent with our caselaw, which requires the comparator's *conduct* to be substantially identical to the plaintiff's. *See, e.g.*, *Madden v. Chattanooga City Wide Serv. Dept.*, 549 F.3d 666, 676 (6th Cir. 2008) (substantially identical requirement met where both employees "threw firecrackers or similar devices"). Although the comparator need not "commit exactly the same" type of misconduct, the "relevant inquiry is whether the comparator's conduct was substantially identical in all of the *relevant* aspects." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 782 (6th Cir. 2016) (citation modified). As discussed, Bergens does not clear that bar.

Bergens also asserts that even if his proffered comparators do not satisfy our traditional requirements, his imperfect-comparator evidence "can be combined with other circumstantial evidence to show" pretext. Bergens Br. 57. But Bergens fails to identify any case where we have taken that approach. To the contrary, our caselaw makes clear that a plaintiff's "proposed comparators must be similar in all relevant respects," which requires the comparator to have "engaged in substantially identical conduct." *Bashaw v. Majestic Care of Whitehall, LLC*, 130 F.4th 542, 551 (6th Cir. 2025) (citations modified). Bergens's proffered comparators don't qualify. They therefore aren't probative of pretext whether viewed alone or alongside other evidence.

C

That leaves Bergens's other-evidence argument. He asserts that several pieces of circumstantial evidence collectively suggest that Diverse Concepts fired him because it worried

that he would not be able to handle opening the Blue Moose Alcoa after his stroke. We consider each piece of evidence separately before evaluating their collective weight. Alone or combined, the result is the same: Bergens cannot show a genuine dispute about pretext under our caselaw.

*Temporal Proximity.* Bergens first points to the temporal proximity between his stroke and his termination. Although "temporal proximity cannot be the sole basis for finding pretext," it can be an "indicator of pretext when accompanied by some other, independent evidence." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (citations modified). Here, however, another principle from our precedent defeats Bergens's reliance on temporal proximity to establish a genuine dispute about pretext: We have held that "an intervening legitimate reason to take an adverse employment action dispels an inference" of discrimination "based on temporal proximity." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013) (citation omitted). The moonshine incident, and the breach of trust it caused, is an "intervening legitimate reason" for termination. *Id.* (citation omitted). After all, "an employer may terminate an employee whose actions undermine the employer's trust." *Bashaw*, 130 F.4th at 549. So the moonshine incident dispels any inference of pretext from mere temporal proximity.

*Coppinger's Hiring.* Bergens next points to Coppinger's hiring as assistant manager after his stroke. He contends that Diverse Concepts planned all along for Coppinger, not him, to serve as the general manager of the Blue Moose Alcoa. As evidence, he asserts that Diverse Concepts "set Coppinger's annual bonus at .5 percent of his restaurant's annual earnings—double Diverse's baseline bonus for new assistant managers" and that Coppinger "began training at the Blue Moose Pigeon Forge months before any other manager." Bergens Br. 23. But Delahunt testified that the bonus for an assistant manager ranged "anywhere from a 0.25% up to . . . 1%." Delahunt Dep., R.28, PageID 295. Coppinger's bonus fell well within that range. Delahunt also testified that

14

Coppinger was initially placed at the Blue Moose Pigeon Forge because Diverse Concepts "had a need to fill" there. *Id.* at PageID 291. He further explained that when Diverse Concepts hired Coppinger, it was not looking for a general manager. Bergens's contention thus amounts to "conjecture and speculation," which is "insufficient to support an inference of discrimination." *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006) (citation modified).

*Failure to Discuss Accommodations.* Bergens also claims that Delahunt and MacDonald never discussed whether he would need accommodations to perform his job as the general manager of the Blue Moose Alcoa. That, in his view, suggests that Diverse Concepts intended to fire him all along. But Bergens's argument misses the mark. For starters, Bergens never asked to discuss accommodations at the Blue Moose Alcoa. His complaint is that Delahunt and MacDonald never raised the issue with him. Yet he elsewhere faults Delahunt and MacDonald for asking him about his recovery and health needs. Bergens, then, contends that Diverse both asked him too much and too little about his health status. Bergens's have-it-both-ways position fails. Beyond that, "even if" Diverse Concepts "failed to accommodate" Bergens's stroke-related needs, that failure alone "would not prove that the stated reason for [his] discharge was pretext for discrimination." *Londo v. UP Health Systems-Marquette*, No. 21-1290, 2021 WL 6112971, at *2 (6th Cir. Dec. 27, 2021).

*Failure to Transfer.* Bergens asserts that Diverse Concepts's failure to transfer another employee to the Blue Moose Alcoa is evidence of pretext. On September 28, Bergens texted MacDonald that Mandy Benton, an assistant manager at another Diverse Concepts restaurant, told him that "she would love to go" work at the Blue Moose Alcoa. MacDonald Text Messages, R.28, PageID 257. Bergens was "[j]ust letting" MacDonald "know" and was "not sure if [Diverse Concepts] transfer[s] like that." *Id.* MacDonald replied that "[w]e are a semi go on that," but he wanted to "discuss" it with Bergens first. *Id.* Ten days later, Delahunt emailed MacDonald and

Diverse Concepts's director of human resources that Benton was "staying put." Delahunt Email, R.32-5, PageID 1091. MacDonald explained at his deposition that Diverse Concepts did not transfer Benton because he spoke to her and "didn't feel like she would be a good fit" because she didn't "ha[ve] the experience or the attitude." MacDonald Dep., R.28, PageID 326.

In Bergens's view, that series of events yields the "well-supported, reasonable inference" that "Delahunt decided not to transfer Benton because he no longer planned for Bergens to open the Blue Moose Alcoa." Bergens Br. 53. But that inference is pure "conjecture and speculation." *Grizzell*, 461 F.3d at 724 (citation omitted). Bergens identifies nothing in the record that supports his assertion or casts doubt on MacDonald's explanation. So Diverse Concepts's failure to transfer Benton is not evidence of pretext.

*Planning.* Bergens further maintains that "it was different" after his stroke because Delahunt and MacDonald stopped including him in preparations for opening the Blue Moose Alcoa. Bergens Dep., R.28, PageID 195. But the record reflects that MacDonald and Bergens consistently communicated about Blue Moose Alcoa via text message in the weeks following Bergens's stroke. MacDonald also invited Bergens to a marketing meeting for the Blue Moose Alcoa on the same day he learned of the meeting's existence. And a planning document from just a few days before Bergens's termination identifies him as the general manager of the Blue Moose Alcoa. Bergens's "personal belief[]" that things were different after his stroke is "insufficient" to create a genuine dispute that Diverse Concepts's proffered reasoning for his firing was pretextual. *Grizzell*, 461 F.3d at 724 (citation omitted).

*Investigation.* Bergens also contends that Diverse Concepts's "failure to conduct any semblance of an investigation into Bergens's conduct" before terminating him is evidence of pretext. Bergens Br. 54. But Diverse Concepts did conduct an investigation. Delahunt and

16

MacDonald watched video footage of the moonshine incident and spoke with Perham. Nothing else was required to learn the core details of what occurred. Bergens's argument thus boils down to an assertion that Diverse Concepts should have conducted a more thorough investigation. Our caselaw forecloses that argument. Employers need not conduct "an optimal investigation—i.e., interviewing the employee and some or all of his witnesses." *Seeger*, 681 F.3d at 286 (citation modified). Diverse Concepts's failure to conduct a more thorough investigation is not sufficient evidence of pretext to defeat summary judgment.

*Progressive-Discipline Policy.* In a related argument, Bergens asserts that Diverse Concepts's failure to follow its progressive-discipline policy is evidence of pretext. An employer's failure to "follow its progressive-discipline policy" is "not enough on its own to establish pretext." *Kean v. Brinker Int'l, Inc.*, 140 F.4th 759, 776 (6th Cir. 2025). But it "can be considered as part of the constellation of evidence" that collectively suggests pretext. *Id.*

Here, though, Diverse Concepts did not deviate from its progressive-discipline policy. The policy "reserves the right to terminate an employee at any time for any reason with or without prior disciplinary counseling or notice." Employee Handbook, R.39-1, PageID 1488. Diverse Concepts was thus "acting within its discretion provided by the policy," which means "no reasonable juror could find that the procedures used to terminate" Bergens were probative of pretext. *Miles*, 946 F.3d at 897.

*Remarks.* The final piece of evidence on which Bergens relies is remarks made by his co-workers and superiors. Bergens points in particular to the "one arm bandit" comments, as well as Delahunt's and MacDonald's statements that they worried about the progress of Bergens's rehab, his ability to train other employees, and his susceptibility to a future stroke. Bergens Dep., R.28, PageID 190-91.

As a general matter, discriminatory remarks "can only serve as" evidence of "pretext if a person in a position to influence the alleged employment decision made them and they are not so isolated or ambiguous as to be nonprobative." *Miles*, 946 F.3d at 896 (citation modified). "[I]solated and ambiguous comments," in other words, "are too abstract" to "support an inference" of discrimination. *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993) (citation modified). That said, we have held in some cases that discriminatory remarks by nondecisionmakers, while not enough to establish a genuine dispute about pretext on their own, can create a "discriminatory atmosphere" that is probative of pretext. *Hayes v. Clariant Plastics & Coatings USA, Inc.*, 144 F.4th 850, 863 (6th Cir. 2025).

Measured against that standard, the one-arm-bandit comments do not create a genuine dispute about pretext. Although Bergens testified that all the managers at Timberwood Grill called him the one-arm bandit, only Perham was "in a position to influence" Bergens's termination. *Miles*, 946 F.3d at 896 (citation omitted). And her use of the one-arm-bandit phrase was "infrequent"—she called Bergens the phrase "once or twice"—which counsels against pretext. *Pelcha*, 988 F.3d at 327; Bergens Dep., R.28, PageID 191. In addition, those comments were not made directly "in connection with [Diverse Concepts's] termination decision." *Pelcha*, 988 F.3d at 327. Nor do the comments appear egregiously offensive, particularly since even Bergens admitted to finding them funny. *Cf. Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 813 (6th Cir. 2020) (finding that "insults and slurs" like "old and fat," "dinosaur," and "over-the-hill" evidenced discrimination). At most, the one-arm-bandit comments from the remainder of the staff might be some evidence of a discriminatory atmosphere at the Timberwood Grill, but are insufficient on their own to create a genuine dispute about pretext. *See Hayes*, 144 F.4th at 863.

Nor do the comments from Delahunt and MacDonald suggest that Diverse Concepts's decision was pretextual. Those comments are not "unambiguously" discriminatory. *Pelcha*, 988 F.3d at 327. Bergens concedes that an employer can ask a disabled employee about his "ability" to "perform job-related functions"—and indeed, elsewhere faults Delahunt and MacDonald for not doing so. 42 U.S.C. § 12112(d)(4)(B). Delahunt's and MacDonald's remarks could fall within that safe harbor, which means they are too "ambiguous" to serve as evidence of pretext. *Pelcha*, 988 F.3d at 325 (citation omitted). And their remarks are a far cry from the "derogatory statements" by managers that we've found to be evidence of pretext in past cases. *E.g.*, *Vincent v. Brewer Co.*, 514 F.3d 489, 497-98 (6th Cir. 2007) (manager stated, *inter alia*, that "women do not belong at" the company and "the problem with you is you're a f***ing woman").

*Collective Weight of the Evidence.* Bergens's final argument is that when "viewed as a whole," the above-mentioned evidence collectively establishes a genuine dispute about pretext. Bergens Br. 6. We have taken that approach in prior cases when a plaintiff identifies multiple pieces of evidence that cannot establish a genuine dispute about pretext on their own but might when combined. *See Kean*, 140 F.4th at 776. Bergens has not made such a showing. Under our caselaw, Bergens's evidence is insufficient, cumulatively or otherwise, to create a genuine dispute about pretext.

\* \* \*

We affirm the judgment of the district court.

19